**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**
_____

**No. 98-51016**
_____

**CHARLES O. GRIGSON, as Trustee for**
**"The Texas Chainsaw Massacre";**
**RIVER CITY FILMS, INC.; ULTRA MUCHOS, INC.,**

**Plaintiffs-Appellants,**

**versus**

**CREATIVE ARTISTS AGENCY, L.L.C.;**
**MATTHEW DAVID McCONAUGHEY,**

**Defendants-Appellees.**
_____

**Appeal from the United States District Court**
**for the Western District of Texas**

_____
April 24, 2000

Before DUHÉ, BARKSDALE, and DENNIS, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Solely at issue is whether the district court abused its discretion by applying equitable estoppel to compel arbitration for an action centered on tortious interference with a contract with an arbitration clause, brought by signatories to the contract against non-signatories, the court holding that, because this action is intertwined with, and dependent upon, that contract, its arbitration agreement should be given effect. We **AFFIRM**.

I.

"Return of the Texas Chain Saw Massacre" (the movie) was filmed in 1993-94; then "obscure actors" Matthew McConaughey and Renee Zellweger acted in it. The movie was produced by Ultra Muchos, Inc., and River City Films, Inc. The trustee for the movie's owners is Charles Grigson.

In October 1995, Ultra Muchos and River City entered into a distribution agreement with Columbia TriStar Home Video, Inc. It was given exclusive distribution rights and complete discretion on how to exercise them; the producers were to receive a percentage of the movie's gross revenue. And, by separate, earlier agreement, the owners were to receive a portion of the producers' percentage.

In the period post-acting in the movie and prior to the fall of 1996, McConaughey signed an agency contract with Creative Artists Agency, L.L.C. The movie's distribution was delayed by TriStar to take advantage of Zellweger and McConaughey's success in subsequent movies. Subsequently, however, TriStar gave the movie only a limited distribution.

In district court in mid-1997, Grigson, as trustee, sued Ultra Muchos, River City, and TriStar for breach of the distribution agreement. But, Grigson quickly and voluntarily had the action dismissed that fall, when TriStar sought to enforce the distribution agreement's arbitration clause, which contains a forum selection provision (Los Angeles County, California).

- 2 -

In late 1997, a few months after the voluntary dismissal of the first action, Grigson, *now joined by Ultra Muchos and River City*, filed this action in state court against McConaughey and Creative Artists (Defendants) for, *inter alia*, tortious interference with the distribution agreement, claiming that such interference occurred between McConaughey's signing with Creative Artists and the movie's limited distribution. In this regard, Defendants allegedly pressured TriStar to limit the release because they viewed it as an improper exploitation of McConaughey's success post-acting in the movie.

After the action was removed to federal court on the basis of diversity of citizenship, Defendants, although non-signatories to the distribution agreement, moved to compel arbitration under the agreement. The same district court that had permitted the voluntary dismissal of Grigson's first action ruled that Grigson, Ultra Muchos, and River City (Appellants) were equitably estopped from relying upon Defendants' being non-signatories. This was based upon holding that, because the claims are so intertwined with, and dependent upon, the distribution agreement, its arbitration clause should be given effect. Accordingly, in the light of the forum selection provision in the arbitration clause, the court dismissed the action so that the parties could proceed in the mandated forum (Los Angeles County, California).

II.

Arbitration is favored in the law. See ***Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp***., 460 U.S. 1, 24-25 (1983). Accordingly, parties to such agreements cannot avoid them by casting their claims in tort, rather than in contract. *See e.g.,* ***Acevedo Maldonado v. PPG Indus., Inc.***, 514 F.2d 614, 616 (1st Cir. 1975). Likewise, proceedings against parties and non-parties to the arbitration agreement are stayed pending the outcome of arbitration, when the action against the non-party is dependent upon interpretation of the underlying contract. *See* ***Subway Equip. Leasing Corp. v. Forte***, 169 F.3d 324, 329 (5th Cir. 1999). Similarly, as discussed *infra*, in certain limited instances, pursuant to an equitable estoppel doctrine, a non-signatory-to-an-arbitration-agreement-defendant can nevertheless compel arbitration against a signatory-plaintiff.

In the distribution agreement, Ultra Muchos, River City, and TriStar agreed

> that any dispute or controversy relating to any of the matters referred to in clauses (d)(i),(ii), or (iii), above, shall be decided by a Rent-A-Judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Los Angeles Superior Court) appointed in accordance with California Code of Civil Procedure Section 638, sitting without a jury, in Los Angeles County California, and the Parties hereby submit to the jurisdiction of such court.

The parties to this action agree that this procedure is the equivalent of arbitration, which would be subject to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* The clauses referenced in the arbitration provision concern

> (i) the validity and interpretation of this agreement, (ii) the performance by the Parties of their respective obligations hereunder, and (iii) all other causes of action (whether sounding in contract or in tort) arising out of or relating to this Agreement....

Because the owners seek compensation through the distribution agreement, Grigson admits that he is a third party beneficiary of that agreement; and that, therefore, he is required, as are the signatory-producers, to arbitrate with TriStar all disputes concerning that agreement. Appellants contend, however, that they are *not* required to arbitrate with Defendants, because they are *not* parties to the distribution agreement; and because, in the alternative, Defendants do not fall within what Appellants view as the quite limited bases for application of equitable estoppel to compel arbitration: either a special relationship to the distribution agreement signatories, or a role in carrying out the agreement's obligations. Creative Artists and McConaughey counter that, because the charged tortious interference is intertwined with the distribution agreement, they are entitled, through application of equitable estoppel, to compel arbitration.

This is an issue of first impression for our circuit. Other circuits have, in a few instances, allowed a non-signatory to a

contract with an arbitration clause to compel arbitration under an equitable estoppel theory, including when the action is intertwined with, and dependent upon, that contract. *E.g., **Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc**.*, 10 F.3d 753, 757 (11th Cir. 1993), *cert. denied*, 513 U.S. 869 (1994); ***Hughes Masonry Co., Inc. v. Greater Clark County Sch. Bldg. Corp.***, 659 F.2d 836, 841 n.9 (7th Cir. 1981).

The Eleventh Circuit has taken the lead in applying equitable estoppel under the intertwined-claims basis. *See also **McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.***, 741 F.2d 342 (11th Cir. 1984). The test, which rejects the narrow strictures urged by Appellants, *see **Sunkist***, 10 F.3d at 757-58, is framed nicely by that circuit in ***MS Dealer Serv. Corp. v. Franklin***, 177 F.3d 942, 947 (11th Cir. 1999):

> Existing case law demonstrates that equitable estoppel allows a nonsignatory to compel arbitration in two different circumstances. *First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory*. When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. *Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or*

- 6 -

> *more of the signatories to the contract.*
> *Otherwise the arbitration proceedings between*
> *the two signatories would be rendered*
> *meaningless and the federal policy in favor of*
> *arbitration effectively thwarted*.

(Internal citations and quotation marks omitted; emphasis added.)

We agree with the intertwined-claims test formulated by the Eleventh Circuit. Each case, of course, turns on its facts. Such equitable estoppel is much more readily applicable when the case presents both independent bases advanced by the Eleventh Circuit for applying the intertwined-claims doctrine. That is the situation here. The linchpin for equitable estoppel is equity — fairness. For the case at hand, to not apply this intertwined-claims basis to compel arbitration would fly in the face of fairness.

For the above-quoted statement from **MS Dealer Serv. Corp.** that equitable estoppel is applied in order to fulfill federal pro-arbitration policy, the Eleventh Circuit quoted from our court's decision in **Sam Reisfeld & Son Import Co. v. S. A. Eteco**, 530 F.2d 679, 681 (5th Cir. 1976), which used an intertwined-claims rationale for staying judicial proceedings against two defendants, with links to a third, pending arbitration with plaintiff. Unlike third-defendant, the other two were *not* signatories to the arbitration agreement with plaintiff. Our court held, accordingly, that the district court had "discretion" to stay the judicial proceedings as to all three defendants, even though, as noted, two

- 7 -

were *not* parties to the arbitration agreement: "[t]he charges against these two defendants were based on the same operative facts and were inherently inseparable from the claims against" third-defendant, a signatory to the agreement. *Id*. Accordingly, our court concluded that the district court had *not* abused its discretion.

Although **Reisfeld** does *not* apply equitable estoppel *per se*, its *ratio decidendi* comports with that for application of that doctrine to allow a defendant non-signatory to an arbitration agreement to compel arbitration with a plaintiff-signatory. In short, although arbitration is a matter of contract and cannot, in general, be required for a matter involving an arbitration agreement non-signatory, a signatory to that agreement *cannot*, in those instances described in **MS Dealer Serv. Corp**., "have it both ways": it cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory. **MS Dealer Serv. Corp**., 177 F.3d at 947; **Hughes Masonry Co.**, 659 F.2d at 838-39. Again, to allow such inconsistent positions would be inequitable, to say the least.

Moreover, as noted, it would be especially inequitable where, as here, a signatory non-defendant is charged with interdependent and concerted misconduct with a non-signatory defendant. In such

instances, that signatory, in essence, becomes a party, with resulting loss, *inter alia*, of time and money because of its required participation in the proceeding. Concomitantly, detrimental reliance by that signatory *cannot* be denied: it and the signatory-plaintiff had agreed to arbitration in lieu of litigation (generally far more costly in terms of time and expense); but, the plaintiff is seeking to avoid that agreement by bringing the action against a non-signatory charged with acting in concert with that non-defendant signatory. Of course, detrimental reliance is one of the elements for the usual application of equitable estoppel. *E.g.*, **In re Coastal Plains**, 179 F.3d 197, 207 (5th Cir. 1999), *petition for cert. filed*, 68 U.S.L.W. 3311 (U.S. 1 Oct. 1999)(No. 99-756).

Accordingly, whether to utilize equitable estoppel in this fashion is within the district court's discretion; we review to determine only whether it has been abused. *E.g., **Scholle Corp. v. Blackhawk Molding Co.***, 133 F.3d 1469, 1471 (Fed. Cir. 1998); **Hoefler v. Babbitt**, 139 F.3d 726, 727 (9th Cir.), *cert. denied*, ___ U.S. ___, 119 S. Ct. 70 (1998). *See **In Re Coastal Plains, Inc.***, 179 F.3d at 205 (judicial estoppel). To constitute an abuse of discretion, the district court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous. *Id*.

- 9 -

The district court did *not* abuse its discretion by concluding "that Plaintiffs' claims are so intertwined with and dependent upon the Distribution Agreement that the arbitration agreement within the Distribution Agreement should be given effect". This conclusion is compelled by comparing the complaint (the operative facts for purposes of the motion to compel arbitration) with the distribution agreement (an exhibit to the complaint). This is quickly and amply demonstrated with but a few examples.

The distribution agreement is *not* the only contract for which tortious interference is claimed. Creative Artists is also charged with such interference with McConaughey's actor's contract for the movie (another exhibit to the complaint); he is charged with breach of that contract. Among other things, he was required by that actor's contract to allow use of "his name and photographs ... for commercial and advertising purposes".

The complaint uses that specific requirement in the actor's contract in describing how, for the theatrical release (as defined in the distribution agreement) mandated by the distribution agreement, TriStar

> had planned to distribute Chainsaw movie posters prominently featuring the likeness and name of McConaughey and, in fact, had printed posters reflecting this plan. Creative Artists, acting for McConaughey, contacted Columbia Tristar and successfully pressured it to retreat from its plan for the posters on the grounds that McConaughey's fame should not be exploited in such a manner in connection with the Chainsaw movie.

This is but part of the charged interference.  In addition, the complaint alleges that the theatrical release was delayed initially to take advantage of Zellweger's post-movie success in another movie, *also released by TriStar*; that the plan changed to take advantage of both actors' success; that Creative Artists, on behalf of McConaughey, "pressured" TriStar to *not* make a major release of the movie and, instead, to make only a limited one, to Appellants' great financial detriment; and that, because of Defendants' actions, "*TriStar failed to exercise its good faith judgment in promoting, exploiting, and distributing*" the movie. (Emphasis added.)

As is obvious from the foregoing, and as the district court concluded, these allegations and claims are intertwined with, and dependent upon, the distribution agreement.  In addition to Appellants relying on the terms of the agreement in asserting their claims, TriStar and Defendants are charged with interdependent and concerted misconduct.

The distribution agreement, in describing the movie, lists Zellweger and two others as "starring" in it; *McConaughey is not so listed*.  All rights to the movie are given to TriStar; and, subject to it making a required minimum expenditure in connection with the theatrical release, TriStar has "*absolute discretion* concerning the exploitation of the [movie] in any and all media".  (Emphasis added.)

In that provision, which obviously lies at the heart of this action, Appellants

> agree[d] that the *good faith judgment* of [TriStar] regarding any matter affecting the exploitation of the [movie] shall be binding and conclusive upon [Appellants] ([TriStar] shall make the determination, *within its sole discretion*, whether or not to release the [movie] in a given media and/or in a given territory).

(Emphasis added.)  "Territory" includes, with some exceptions, "[t]he entire universe", while "media" includes, but is *not* limited to, movie theaters.

And, as noted, the distribution agreement's arbitration clause pertains, *inter alia*, to the "interpretation of [the distribution] agreement, ... the performance by the Parties of their respective obligations [there]under, and ... all other causes of action (whether sounding in contract *or in tort*) arising out of *or relating to* this Agreement".  (Emphasis added.)

In short, the scope of the distribution, the "discretion", both "absolute" and "sole", vested in TriStar, and its "good faith judgment" are at the center of this dispute.  Among other things, TriStar is charged with, as a result of the claimed interference ("pressure"), *not* using its "good faith judgment".  Although *not* sued (an obvious attempt to make an end-run around the arbitration clause, as discussed *infra*), TriStar nevertheless will be involved extensively — and, no doubt, quite expensively — in this dispute,

including whether it performed properly under the distribution agreement.

As stated, the foregoing are but a few examples of the intertwining of the claims with the distribution agreement, including the claimed concerted actions by Defendants (non-signatories), with TriStar, a signatory. How possible damages might be computed, in the light of the detailed "accounting" provisions of the agreement, is but another example.

This action is quite similar to Grigson's first action — against TriStar, discussed below. After quickly instituting a voluntary dismissal of that action, when TriStar moved to compel arbitration, Appellants brought this one against McConaughey and Creative Artists, non-signatories to the distribution agreement, for, *inter alia*, interfering with that agreement. As noted, this is a quite obvious, if not blatant, attempt to bypass the agreement's arbitration clause.

In Grigson's first action, against the two producers (who joined Grigson in this second action) and TriStar, Grigson charged TriStar, as it is also alleged to have done in the action at hand, with "breach[ing] the 'good faith judgment' clause ... of the distribution agreement". In the alternative, TriStar was charged with fraud. And, the producers, charged with failing to exploit the movie in breach of their contract with the owners, cross-claimed against TriStar. One of the exhibits to the complaint is

- 13 -

a 7 January 1997 letter to TriStar from one of the persons owning rights to the movie, in which he stated that he and another similarly-situated person (who had also directed the movie) were "very eager to know what [was] being done by [TriStar] to fully explore the financial possibilities of [the movie]", and then advised: "It goes without saying that [TriStar] has *absolute discretion* in making those determinations but this does not change my obligation to my investors to see that those decisions are based on what is best for this film". (Emphasis added.) When TriStar moved promptly to compel arbitration, the owners and cross-claim producers quickly folded their tents. The action, filed in district court on 9 June 1997, was dismissed without prejudice on 10 September 1997.

The action at hand was filed two and one-half months later, on 22 December 1997. This time, it was filed in state court. *TriStar was no longer a defendant*. Its earlier-charged failure to use its contractually required "good faith judgment" was now alleged to have been caused by "pressure" from the new defendants, Creative Artists and McConaughey. In reality, the two actions are the same. *In essence, TriStar is a defendant*. Each action turns on the meaning of the distribution agreement's numerous — often intricate — provisions, which are unique to the film industry, and on TriStar's conduct in relation to that agreement.

Arguably, the inconsistent positions by Grigson and the two producers in the first and second actions bump up on, if indeed do not satisfy, the prerequisites for judicial estoppel. *See **In re Coastal Plains***, 179 F.3d at 205-07 (purpose of doctrine is to prevent parties "playing fast and loose with the courts"). Judicial estoppel is *not* raised; but, because that doctrine protects the judicial system, **id**., we can apply it *sua sponte* in certain instances. *See **United States For Use of Am. Bank v. C.I.T. Constr. Inc***., 944 F.2d 253, 258 (5th Cir. 1991).

In any event, comparison of the two actions demonstrates, quite vividly, why the district court, *which presided over both actions*, did *not* abuse its discretion in compelling arbitration in the second, by applying the equitable estoppel doctrine crafted for such situations. The claims are intertwined with, and dependent upon, the distribution agreement, including, but *not* limited to, Defendants (non-signatories) and TriStar (non-defendant signatory) being charged with interdependent and concerted misconduct. Indeed, this action is the quintessential situation for when the doctrine should be applied.

### III.

For the foregoing reasons, the judgment is

*AFFIRMED*.

DENNIS, Circuit Judge, dissenting:

"[N]early anything can be called estoppel.  When a lawyer or a judge does not know what other name to give for his decision to decide a case in a certain way, he says there is an estoppel."[1] The trouble with that kind of use of the estoppel label by the majority in this case making circuit precedent is that it will seriously hinder this court in upholding the basic principle that a person has a right to a court's decision about the merits of a dispute unless he has agreed to submit it to arbitration.  Because the majority decision conflicts with the Supreme Court's recent emphatic affirmations of that principle, and the precedents of this circuit, I respectfully dissent.

In *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995), the Supreme Court reaffirmed important contractual arbitration principles: (1) <u>Contract Governs Whether A Dispute Is Arbitrable Or Litigable</u>: "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes–but only those disputes–that the parties have agreed to submit to arbitration."[2]  "[A] party who has not agreed to

_____

[1] Statement of Samuel Williston, 4 ALI Proceedings 61, 89-90 (1926) (quoted by 4 RICHARD A. LORD, WILLISTON ON CONTRACTS § 8.5, at 73 (4th ed. 1992)) [hereinafter WILLISTON].

[2] *First Options,* 514 U.S. at 943 (citing *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57-58 and

- 16 -

arbitrate will normally have a right to a court's decision about the merits of its dispute[.]"[3]   (2) <u>State-Law Contract Principles Govern Standing And Obligation To Arbitrate</u>: "When deciding whether the parties agreed to arbitrate a certain matter...courts generally...should apply ordinary state-law principles that govern the formation of contracts."[4]    (3) <u>Parity Of Contractual Enforcement</u>: "After all, the basic objective in this area is not to resolve disputes in the quickest manner possible, no matter what the parties' wishes,[5] but to ensure that commercial arbitration agreements, like other contracts '"are enforced according to their terms,"'[6] and according to the intentions of the parties[.]"[7] (4)<u>Standard of Review</u>: "[R]eview of...a district court decision confirming an arbitration award on the ground that the parties

---

n.9 (1995); *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 271 (1995); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 , 625-26 (1985)).

[3]*Id.* at 942.

[4] *Id.* at 944 (citing *Mastrobuono*, 514 U.S. at 62-63 & n.9; *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 475-76 (1989); *Perry v. Thomas*, 482 U.S. 483, 492-93 n.9 (1987); 1 GABRIEL M. WILNER, DOMKE COMM ARBITRATION § 4:04, at 15 (Rev. Ed. 1993)) [hereinafter DOMKE].

[5]*Id.* at 947 (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219-20 (1985)).

[6]*Id.* (citing *Mastrobuono*, 513 U.S. at 54 (quoting *Volt Information Sciences*, 489 U.S. at 479)).

[7]*Id.* (citing *Mitsubishi Motors*, 473 U.S. at 626; *Allied-Bruce*, 513 U.S. at 271).

agreed to submit their dispute to arbitration, should proceed like review of any other district court decision finding an agreement between parties, e.g., accepting findings of fact that are not 'clearly erroneous' but deciding questions of law de novo."[8] (Internal citations placed in footnotes).

*Air Line Pilots Ass'n v. Miller*, 523 U.S. 866 (1998), strongly confirmed these principles in holding that non-union pilots challenging the agency fee collected by the union could not be required to arbitrate their challenges because they had not agreed to do so: "Ordinarily, 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Id.* at 876 (citing *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)); *see also First Options*, 514 U.S. at 942 ("a party who has not agreed to arbitrate will normally have a right to a court's decision about the merits of its dispute").

As a general rule, an arbitration clause cannot be invoked by a non-party to the arbitration contract, and only parties to the arbitration agreement are bound to arbitrate. *See* 1 GABRIEL M. WILNER, DOMKE COMM ARBITRATION § 10:00, at 1 (Rev. Ed. 1993) (citing, *inter alia*, *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287 (3d Cir. 1996); *Gingiss Int'l v. Bormet*, 58 F.3d 328 (7th Cir. 1995); *United*

---

[8]*First Options,* 514 U.S. at 947-48 (citing *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1509 (3d Cir. 1994)).

*States v. Harkins Builders, Inc.*, 45 F.3d 830 (4th Cir. 1995)) [hereinafter DOMKE]. The federal policy favoring arbitration is strong, but it alone cannot authorize a non-party to invoke arbitration or require a non-signatory to arbitrate. *See id.* Nonetheless, a non-signatory may be bound by or acquire rights under an arbitration agreement under ordinary state-law principles of agency or contract. *Id.; First Options,* 514 U.S. at 944.

Courts have recognized a number of theories arising out of common law principles of contract and agency law under which non-signatories may be bound to the arbitration agreements of others. For example, 1) incorporation by reference; 2) assumption by conduct; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel. *See Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776-80 (2d Cir. 1995) (citing as examples *Matter of Arbitration Between Keystone Shipping Co. & Texport Oil Co.*, 782 F.Supp. 28, 31 (S.D.N.Y. 1992)(incorporation by bill of lading); *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1105 (2d Cir.)(assumption by conduct), *cert. denied*, 502 U.S. 910 (1991); *Interbras Cayman Co. v. Orient Victory Shipping Co., S.A.*, 663 F.2d 4, 6-7 (2d Cir. 1981) (agency); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l. Inc.*, 2 F.3d 24, 26 (2d Cir. 1993)(veil-piercing); *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,* 933 F.2d 131, 138-39 (2d Cir. 1991)(same); *Deloitte Noraudit A/S v. Deloitte*

*Haskins & Sells*, *U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993)(non-signatory bound to arbitration contract by estoppel)).

In theory, under ordinary state-law principles of equitable and promissory estoppel, a non-party to a contract containing an arbitration clause may invoke the clause and compel a signatory party to arbitrate when the signatory reasonably should have expected that, because of his statements or conduct, the non-signatory would be induced to rely justifiably on the contract and would be injured thereby if the signatory refused to recognize the non-signatory's rights or entitlements with respect to the contract.[9]  However, there have been few, if any, cases in which a non-signatory has successfully invoked an arbitration clause against a party signatory to the contract under ordinary equitable or promissory estoppel principles.  In a relatively few arbitration cases, a non-signatory to the arbitration agreement has been allowed to compel arbitration under a spurious estoppel theory when the peculiar integrated or interlocking circumstances of the parties' relationships, related contracts, contractually assigned responsibilities, conduct, and disputes would allow the inference that the signatory and non-signatory parties have by an agreement

---

[9] *See, e.g.*, WILLISTON, *supra* note 1, §§ 8.3 and 8.4; RESTATEMENT (SECOND) OF CONTRACTS § 90(1) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.  The remedy granted for breach may be limited as justice requires."); *cf.* 1 DOMKE § 10.07, at 18.

implied in fact become bound reciprocally by the arbitration clause or the contract of which it is a part. *See MS Dealer Service Corp. v. Franklin*, 177 F.3d 942 (11th Cir. 1999); *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753 (11th Cir.), *cert. denied*, 513 U.S. 869 (1994); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315 (4th Cir. 1988); *McBro Planning & Development Co. v. Triangle Elec. Const. Co., Inc.*, 741 F.2d 342 (11th Cir. 1984); *Hughes Masonry Co., Inc. v. Greater Clark County School Bldg. Corp.*, 659 F.2d 836 (7th Cir. 1981); *cf.* 1 DOMKE § 10:07, at 18-20.

In truth, however, the bases of facts and reasoning upon which the courts in those cases ordered a signatory to an arbitration agreement to arbitrate a dispute with a non-signatory have the earmarks of a foundation for an agreement implied in fact rather than an ordinary equitable or promissory estoppel. In the courts' opinions the non-signatory is said to have standing to compel a signatory to arbitrate, rather than litigate, a justiciable claim against the non-signatory, if, in addition to other significant factors, there is a close relationship between signatory and non-signatory entities and the signatory's claim against the non-signatory is intertwined with an arbitrable dispute under the contract. However, the facts in those cases which made the relationships "close" and the claims "intertwined," viz., the disputants' voluntary and knowing formation of (and performance

- 21 -

under) interlocking or integrated contracts, their bargained for exchanges of promises and/or performances between themselves and others, and, in *Sunkist* and *J.J. Ryan*, the parent-subsidiary corporate relationship, indicate the existence of an implied in fact agreement rather than an ordinary equitable or promissory estoppel.

"An agreement implied in fact is 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Hercules, Inc. v. United States*, 516 U.S. 417, 424 (1996)(quoting *Baltimore & Ohio R. Co. v. United States*, 261 U.S. 592, 597 (1923)).[10] The doctrine of equitable estoppel generally provides "that a representation of past or existing fact made to a party who relies upon it reasonably may not thereafter be denied by the party making the representation if permitting the denial would result in injury or damage to the party who so

_____

[10] *See* 1 WILLISTON § 1.5, at 18-20 (citing, *inter alia*, *Wood v. Ingram*, 275 S.W. 397 (Tex.Civ.App. 1925)(writ dism w.o.j.)), and stating: "The Restatement (Second)[Of Contracts §§ 4 & comment a; 91 & comment a]....indicates that a promise may be stated in words or may be inferred wholly or partly from conduct....a contract by conduct is, in essence, an implied in fact contract....the Restatement, as well as the numerous cases, make the concept abundantly clear." *Id.* at 24-25; *see also* 4 WILLISTON §§ 8.3 and 8.4.

relies."[11]  The widely accepted general statement of promissory estoppel, which developed against the backdrop of equitable estoppel, is set forth by RESTATEMENT (SECOND) OF CONTRACTS § 90(1): "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.  The remedy granted for breach may be limited as justice requires."  In determining whether a person is bound either by an agreement implied in fact or by the ordinary principles of equitable or promissory estoppel, it should be kept in mind that "[j]ust as assent may be manifested by words or other conduct, sometimes including silence, so intention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance."[12] A brief review of *Hughes, McBro, Sunkist* and *MS Dealer* shows ample evidence of assents and promises that may have more appropriately warranted basing those decisions  on agreements implied in fact, or perhaps on ordinary promissory estoppel, rather than upon the highly abstract new theory of an "estoppel" loosely based on

---

[11] 4 WILLISTON § 8.3, at 28-30 (citing, *inter alia*, *Morton v. Samuels,* 268 S.W.2d 490 (Tex.Civ.App. 1954, writ ref'd n.r.e.)).

[12]RESTATEMENT (SECOND) OF CONTRACTS § 4,comment a.

"close" relationships, "intertwined" claims, and other variable factors.

The facts in *McBro* and *Hughes* were highly suggestive of an implied in fact agreement between the parties to be mutually bound by the contract containing the arbitration clause.[13] In each case a construction contractor entered a contract with the owner of the proposed facility containing an arbitration clause. The same contract designated a non-signatory party as construction manager and outlined the duties of the owner, construction contractor, construction manager, and, in one case, the architect, with respect to the construction project. The construction managers in both cases had not signed the owner-contractor agreement but had signed separate contracts containing similar arbitration clauses with either the owner or the owner's architect. By performing duties and accepting benefits under the interlocking and integrated system

---

[13]See II IAN R. MACNEIL ET AL., FEDERAL ARBITRATION LAW, § 18.2.3 (Supp. 1999) (analyzing the Eleventh Circuit cases of *McBro Planning & Development Co. v. Triangle Elec. Const. Co., Inc.*, 741 F.2d 342 (11th Cir. 1984) and acknowledging the opinion's heavy reliance on *Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836 (7th Cir. 1981), the editors conclude: "It should be noted that the action estopping Triangle was apparently its contracting with Hospital in the first place and performing under that contract. Thus the court could just as well have put the result in terms of consent. That is to say, Hospital and McBro could have reasonably understood from Triangle's contracting with the hospital with knowledge of the terms of the Hospital-McBro contract that Triangle was consenting to be bound by the arbitration clause. The decision is probably most useful in simply broadening out conceptions of consent, rather than in introducing any truly separate doctrine.").

of construction contracts and relationships the contractors impliedly agreed to be bound to arbitrate disputes with the construction managers concerning the performance of the managers' duties assigned by and performed under the owner-contractor agreement, although the managers had only signed the related but separate contract documents between themselves and the owner or its architect.

In *Sunkist* a non-signatory parent corporation was granted standing to arbitrate disputes arising out of the performance of a contract containing an arbitration clause between the parent's wholly owned subsidiary and the other signatory to the contract. The court relied not only on the close relationships of the entities and the close resemblance of the arbitrable and litigable claims but also on a form of corporate veil piercing: "'When the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration.'" *Sunkist*, 10 F.3d at 757 (quoting *J.J. Ryan,* 863 F.2d at 320-21). The Fourth Circuit in *J.J. Ryan* relied on the foregoing veil piercing language quoted from its opinion and merely noted in passing that the same result had been reached under a theory of equitable estoppel in *McBro*. *See J.J. Ryan*, 863 F.2d at 321.

In *MS Dealer*, Sharon Franklin agreed to purchase a car from Jim Burke Motors and signed a buyer's order with Burke. The buyer's order incorporated by reference a retail installment contract between Franklin and Burke which provided that Franklin was being charged $990.00 for a service contract under which MS Dealer Service Corporation (apparently designated by name in the buyer's order) agreed to provide services for Franklin's car. (The court of appeal's opinion suggests that MS Dealer entered an oral or written contract with Burke or Franklin or both to provide services for Franklin's car.) The buyer's order contained an arbitration clause which provided that "all disputes and controversies of every kind and nature between buyer and Jim Burke Motors, Inc. arising out of or in connection with the purchase of this vehicle will be resolved by arbitration." Also, in another passage, the buyer's order stated that "[a]ll disputes and controversies of every kind and nature between the parties hereto arising out of or in connection with this contract" shall be submitted to arbitration. MS Dealer did not sign the buyer's order or the installment contract.

Franklin sued Burke and MS Dealer in state court claiming that MS Dealer improperly conspired and colluded with Burke and Chrysler Credit Corporation, the assignee of the retail installment contract, in a scheme to defraud her by imposing an excessive charge of $990.00 for the service contract and dividing the excess

amount. Burke filed a motion in state court to compel Franklin to arbitrate, which was granted and resulted in an arbitration award in favor of Burke and a dismissal of the state suit against Burke. MS Dealer sued Franklin in federal district court to compel her to arbitrate her claims against it. The court of appeals reversed the district court's dismissal of MS Dealer's petition and granted the defendants' motion to stay the action and compel arbitration.

The *MS Dealer* court, in concluding that Franklin was equitably estopped from avoiding arbitration with MS Dealer, stated:

> It is important to note that Franklin's obligation to pay the $990.00 charge arose under the Buyers Order and that she specifically alleges that MS Dealer worked hand-in-hand with Jim Burke and Chrysler Credit Corporation in this alleged fraudulent scheme. Her 'allegations of such pre-arranged, collusive behavior establish[] that [her] claims against [MS Dealer are] intimately founded in and intertwined with the obligations imposed by the [Buyers Order].'

*MS Dealer,* 177 F.3d at 948 (quoting *Boyd v. Homes of Legend, Inc.*, 981 F.Supp. 1423, 1433 (M.D.Ala. 1997)).

As in *Hughes* and *McBro*, the circumstances of interlocking and integrated contracts would allow the inference that both Franklin and MS Dealer had agreed to arbitrate any dispute between them

arising out of or connected with Franklin's purchase of the automobile. Indeed, the ambiguous buyer's order contract reasonably could be construed to include MS Dealer as one of the "parties hereto." Further, Franklin reasonably should have understood that MS Dealer agreed to provide the service contract in exchange for the compensation it was to receive under the buyer's order and the retail installment contract and would call upon her to arbitrate any dispute related to the formation or performance of the service contract. Moreover, because Franklin's allegations of Burke's fraudulent overcharging for the service contract was clearly an arbitrable dispute arising out of and connected with the purchase of the vehicle, MS Dealer's alleged conspiracy and collusion with Burke in the fraudulent overcharge was an essential part of the arbitrable dispute between Franklin and Burke.

Nevertheless, the Eleventh Circuit chose to use the spurious estoppel theory or label and, in justifying its decision, attempted to draw from the case some abstract "equitable estoppel" explanatory principles:

> First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims' against the non-signatory.

> *Sunkist Soft Drinks*, 10 F.3d at 757. When each of a
> signatory's claims against a non-signatory 'makes
> reference to' or 'presumes the existence of' the written
> agreement, the signatory's claims 'arise[ ] out of and
> relate[ ] directly to the [written] agreement,' and
> arbitration is appropriate. *Id.* at 758. Second,
> 'application of equitable estoppel is warranted ... when
> the signatory [to the contract containing the arbitration
> clause] raises allegations of ... substantially
> interdependent and concerted misconduct by both the
> nonsignatory and one or more of the signatories to the
> contract.' *Boyd*, 981 F.Supp. at 1433.

*MS Dealer*, 177 F.3d at 947. The remainder of the *MS Dealer*
opinion, however, in its painstaking analysis of the facts and
reasoning based on all of the circumstances involved, indicates no
intention that the foregoing principles should be applied as free-
standing rules of law. The Eleventh Circuit concluded that
Franklin was compelled to arbitrate her dispute with MS Dealer only
after pointing out facts indicating that both parties had actually
manifested their mutual assent to a bargain in which they exchanged
promises of performances with each other and with Jim Burke Motors;
that the buyer's order incorporating the arbitration clause and the
retail installment contract, which incorporated the service

contract with MS Dealer, were all parts of the bargain of which Franklin, MS Dealer, and Burke were aware or should have been aware before they entered the agreement; and that, if MS Dealer was a co-conspirator with Burke in defrauding Franklin as she alleged, her claim against MS Dealer was part of her dispute with Burke, with whom she was a co-signatory of the arbitration agreement. *See id.* at 947-49.

On the other hand, the Second Circuit, in *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773 (2d Cir. 1995), refused to accept "[a]nything short of requiring a *full* showing of some accepted theory under agency or contract law" before compelling arbitration between a signatory and a non-signatory. *Id.* at 780. In *Thomson*, the court of appeals reversed the district court's order compelling a non-signatory parent corporation to arbitrate a dispute with a third party under an arbitration agreement signed by the parent's subsidiary corporation prior to the parent's acquisition of the subsidiary. The district court had determined that the claims of the third party, E & S, did not fall within any of the traditional theories for binding a non-signatory, but nevertheless ordered Thomson, the non-signatory, to arbitrate a dispute with E & S, applying a "hybrid approach" based on Thomson's conduct in voluntarily becoming an affiliate of its subsidiary, Rediffusion, on the degree of control Thomson exercised over Rediffusion, and on the interrelatedness of the issues. In so

doing, the Second Circuit held, "the district court improperly extended the law of this Circuit and diluted the protections afforded nonsignatories by the 'ordinary principles of contract and agency.' A nonsignatory may not be bound to arbitrate except as dictated by some accepted theory under agency or contract law." *Id.* at 780 (quoting *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980))(internal citation omitted).

The *Thomson* court addressed a situation in which a signatory seeks to compel a non-signatory, the inverse of the pattern in *MS Dealer*, *Sunkist*, *J.J. Ryan*, *McBro* and *Hughes*. Nonetheless, *Thomson* lends support to the conclusion that the *Hughes-McBro* line of cases lacked a valid basis in the ordinary principles of estoppel or veil-piercing for compelling the signatories to arbitrate with the non-signatories. Instead, as *Thomson* implicitly suggests, in *MS Dealer, McBro and Hughes*, the only valid basis for compelling the signatories to arbitrate with the non-signatories was that their knowing participation in the reticulated transactional arrangements, and their performance and conduct thereunder, allowed the inference that they agreed to be mutually bound by the contract including the arbitration clause. After taking *Sunkist*, *J.J. Ryan*, and *McBro* into account, the Second Circuit in *Thomson* distinguished them as inapposite to the case before it on several grounds, including: (1) when Thomson acquired Rediffusion as its subsidiary, Thomson explicitly disavowed any obligations under the working

- 31 -

agreement, including the arbitration clause, between Rediffusion and E & S, *see Thomson*, 64 F.3d at 777; (2) "[v]eil piercing determinations are fact specific and 'differ[] with the circumstances of each case.'", *Id.* at 777-78 (quoting *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir.), *cert. denied*, 488 U.S. 852 (1988)); "E & S has not demonstrated that Thomson exerted the degree of control over Rediffusion necessary to justify piercing the corporate veil.", *Id.* at 778; (3) "Thomson...cannot be estopped from denying the existence of an arbitration clause to which it is a signatory because no such clause exists. At no point did Thomson indicate a willingness to arbitrate with E & S." *Id.* at 779; (4) "[t]he district court...improperly extended the limited theories upon which this Court is willing to enforce an arbitration agreement against a non-signatory. The district court's hybrid approach dilutes the safeguards afforded to a non-signatory by the 'ordinary principles of contract and agency' and fails to adequately protect parent companies, the subsidiaries of which have entered into arbitration agreements." *Id.* at 780.

The Second Circuit's adherence to "ordinary principles of contract and agency" in *Thomson* was consistent with the Supreme Court's admonition and example it set in *First Options* as to the application of ordinary state law principles of contracts to determine whether the parties agreed to arbitrate a certain matter. As mentioned above, the Court in *First Options* instructed:

When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below) should apply ordinary state-law principles that govern the formation of contracts....The relevant state law here, for example, would require the court to see whether the parties objectively revealed an intent to submit the arbitrability issue to arbitration. [citing an Illinois case for the law of the state whose law governed the workout agreement and a Pennsylvania case for the law of the state where the Kaplans objected to arbitrability]

*First Options*, 514 U.S. at 944 (internal citations omitted).

The plaintiffs brought the present suit against Creative Artists and McConaughey in a Texas state court asserting a Texas state tort claim for interference with contract. Thus, the ordinary state law principles of Texas governing the formation of contracts should be applied to determine whether the plaintiffs agreed to arbitrate this matter with the defendants. The trial court acknowledged that neither of the defendants were signatories to the contract between the plaintiffs and Columbia TriStar. The trial court did not find that the plaintiffs and defendants had entered an agreement, express or implied in fact, to arbitrate the tortious interference with contract claim. Instead, the trial

court determined that the plaintiffs were bound by equitable estoppel to arbitrate the matter with the defendants. On appeal the defendants also rely solely on equitable estoppel.

All American jurisdictions adopt and apply a theory of promissory estoppel grounded in section 90 of the contracts restatements. 3 ERIC MILLS HOLMES, CORBIN ON CONTRACTS, § 8.12, at 58 (Joseph M. Perillo ed., rev. ed. 1997) [hereinafter CORBIN]. This theory is an outgrowth of and includes the earlier doctrine of equitable estoppel. *See* 1 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 2.19, at 137-40 (1990 and Supp. 1998); 3 CORBIN § 8.11, at 46. Recent Texas decisions cite and apply the second Restatement § 90. *See* 3 CORBIN § 8.12, at 188 (citing *City of Beaumont v. Excavators & Contractors*, *Inc.*, 870 S.W.2d 123, 136, 154 (Tex.App. 1993, writ denied) (citing RESTATEMENT (SECOND) OF CONTRACTS § 90); *Traco, Inc. v. Arrow Glass Co., Inc.*, 814 S.W.2d 186, 190 (Tex.App. 1991, writ denied); *First State Bank in Archer City v. Schwartz Co.*, 687 S.W.2d 453 (Tex.App.1985, writ ref'd n.r.e.)). The current three-prong Texas promissory estoppel requisites, however, were fashioned from the first Restatement in the 1960s: (1) a promise, (2) foreseeability of reliance by the promisor, and (3) substantial reliance by the promisee to its detriment. *Id.* (citing, *e.g.*, *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983); *Randle v. NCNB Texas Nat'l Bank*, 812 S.W.2d 381 (Tex.App. 1991); *Aubrey v. W.O. Workman*, 384 S.W.2d 389, 395 (Tex.Civ.App. 1964, writ ref'd

n.r.e.)).  Later decisions added: (4) reliance on the promise must be reasonable, and (5) the promise will be enforced if necessary to avoid injustice.  *Id.* (citing Texas cases).

Applying the Texas state-law principles governing the formation of contracts and promissory estoppel, it is evident that the plaintiffs should not be compelled to arbitrate their tortious interference with contract claim with Creative Artists and McConaughey.  There was no agreement between these parties, express or implied, to arbitrate that dispute.  None of the requisites of section 90 of the RESTATEMENT (SECOND) OF CONTRACTS or of the Texas three-prong promissory estoppel have been established.  There is no evidence that the plaintiffs promised the defendants anything, that they could foresee any reliance by the defendants, or that the defendants relied on a promise by the plaintiffs to defendants' detriment.[14]

---

[14] The district court apparently relied on *Sunkist*, *McBro* and two Texas decisions, *Carlin v. 3V Inc.*, 928 S.W.2d 291 (Tex.App.-- Houston [14th Dist.] 1996, no writ) and *Fridl v. Cook*, 908 S.W.2d 507(Tex.App.-El Paso 1995, writ dism'd w.o.j.).  These decisions are not relevant to the present case.  *Sunkist* and *McBro* are inapposite for the reasons stated earlier.  *Carlin* is inapt because its essential holding was simply that an assignee of an assignor's rights and duties under a contract assumes and is bound by the arbitration clause in the contract when the assignee asserts a breach of contract claim under the contract against the other signatory party to the contract.  *Fridl* is irrelevant because its main holding was simply that a breach of contract claim based on a contract containing an arbitration clause is subject to arbitration.

For all of these reasons, I believe that the majority has fallen into a number of serious, harmful legal errors in the present case. The amorphous, misnamed estoppel theories of *MS Dealer, Sunkist, McBro*, and *Hughes* conflict with and endanger the basic principles that the Supreme Court has held must be adhered to in compelling a person to submit to commercial arbitration, viz., (1) a person cannot be required to submit to arbitration any dispute which he has not agreed so to submit, (2) a person who has not agreed to arbitrate will normally have a right to a court's decision about the merits of its dispute, and (3) ordinary state-law principles governing the formation of contracts should be applied when deciding whether the parties agreed to arbitrate a certain matter. This court is not bound by the court of appeals' decisions in the *Hughes-McBro* line of cases and should not attempt to follow them.

However, the majority erroneously attempts to follow *MS Dealer* and compounds its error by mistaking *MS Dealer's* highly abstract explanatory "equitable estoppel" principles for the Eleventh Circuit's complete *ratio decidendi*. Consequently, the majority overlooks the significance of the material facts upon which the *MS Dealer* decision is actually based. In contrast with the present uncomplicated case, *MS Dealer* involved an integrated network of interlocking agreements anchored in a buyer's order containing an arbitration agreement. The signatories of the buyer's order,

Franklin and Jim Burke Motors, and the non-signatory of those two documents, MS Dealer, struck a bargain in which each person agreed to exchange promises of performance with the others. *See* RESTATEMENT (SECOND) OF CONTRACTS § 17. Each of the three parties manifested mutual assent to the bargain or exchanges of promises by intentional conduct from which he or she knew or had reason to know the other parties would infer such assent. *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 18, 19. Each of the parties, including Franklin in particular, knew or had reason to know that the buyer's order contained an arbitration agreement and incorporated by reference the retail installment contract and the vehicular service contract. Thus, the rationale of *MS Dealer* can be viewed as limited by its material facts and even as an enforcement of an agreement implied in fact. Consequently, if *MS Dealer* merely enforces an agreement implied in fact, it does no violence to the principles that a party cannot be forced to submit to arbitration a dispute that he has not agreed to so submit according to the application of ordinary state-law principles that govern the formation of contracts. The majority, on the other hand, by disregarding the important material facts underlying *MS Dealer*, and by adopting and applying only that decision's skeletal explanatory theory, unleashes an indeterminate precedent capable in its application of sweeping countless parties' disputes into arbitration without even a semblance of their

agreement under ordinary state-law principles of contracts, agency or equitable estoppel.

The majority also misstates the applicable standard of review, although the error may not have had any effect upon its decision. In *First Options*, the Supreme Court held that the standard a court of appeals should apply when reviewing a district court decision that refuses to vacate or confirms an arbitration award should proceed by accepting findings of fact that are not clearly erroneous but deciding questions of law de novo. *See First Options*, 514 U.S. at 948. "We believe...that the majority of Circuits is right in saying that courts of appeals should apply ordinary, not special, standards when reviewing district court decisions upholding arbitration awards. For one thing, it is undesirable to make the law more complicated by proliferating review standards without good reasons." *Id.* This court followed *First Options* in *General Motors Corp. v. Pamela Equities Corp.*, 146 F.3d 242, 246 (5th Cir. 1998) and *F.C. Schaffer & Assocs., Inc. v. Demech Contractors, Ltd.*, 101 F.3d 40, 43 (5th Cir. 1996). Accordingly, the standard of review should be the same in this case in which we are reviewing a district court's decision that compels parties either to submit a dispute to arbitration (that they contend they have not agreed to so submit) or to abandon their right to a court's decision about the merits of the dispute. Previous decisions of this circuit and others have said that we

review the grant or denial of a motion to compel arbitration de novo. *See Webb v. Investacorp, Inc.*, 89 F.3d 252, 257 (5ᵗʰ Cir. 1996); *Snap-On Tools Corp. v. Mason*, 18 F.3d 1261, 1264 (5ᵗʰ Cir. 1994); *Armijo v. Prudential Ins. Co. of Am.*, 72 F.3d 793, 796 (10ᵗʰ Cir. 1995); *Kidd v. Equitable Life Assurance Soc'y of the United States*, 32 F.3d 516, 518 (11ᵗʰ Cir. 1994); *Sunkist*, 10 F.3d at 756; *Britton v. Co-op Banking Group*, 4 F.3d 742, 744 (9ᵗʰ Cir. 1993); *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Engineers*, *AFL-CIO*, 982 F.2d 884, 887 (3d Cir. 1992); *MidAmerica Federal Sav. and Loan Ass'n v. Shearson/American Express, Inc.*, 886 F.2d 1249, 1259 (10ᵗʰ Cir. 1989). Paradoxically, the majority opinion states that we review to determine only whether the district court has abused its discretion in applying equitable estoppel, but that an application of law that is erroneous, or an assessment of the evidence that is clearly erroneous, constitutes an abuse of discretion. These contradictory statements of the standard can only lead to confusion. In my opinion, abuse of discretion does not belong in our standard for reviewing whether the ordinary state-law requisites of promissory or equitable estoppel have been met, but the district court may well have discretion in limiting the remedy as justice requires. *See* RESTATEMENT (SECOND) OF CONTRACTS § 90(1).