SUNKIST SOFT DRINKS, INC., Plaintiff,

Del Monte Corporation, Nabisco Brands, Inc., Plaintiffs–Appellees,

v.

SUNKIST GROWERS, INC.,
Defendant–Appellant.

No. 91–9153.

United States Court of Appeals,
Eleventh Circuit.

Dec. 30, 1993.

Emmet J. Bondurant, II, Edward Bryan Krugman, Bondurant Mixson & Elmore, Atlanta, GA, Deseriee A. Kennedy, Robert G. Badal, Wayne M. Smith, Jill F. Cooper, Pepper Hamilton & Scheetz, Martin J. Trupiano, Les J. Weinstein, Graham & James, Los Angeles, CA, for defendant-appellant.

David R. Aufdenspring, Powell Goldstein Frazer & Murphy, P.C., Atlanta, GA, Virginia S. Taylor, Kilpatrick & Cody, Atlanta, GA, George L. Little, Jr., Rodrick J. Enns, J. David Mayberry, Petree Stockton & Robinson, Winston Salem, NC, for plaintiffs-appellees.

Before ANDERSON, Circuit Judge and MORGAN and JOHNSON, Senior Circuit Judges.

MORGAN, Senior Circuit Judge:

The appellant appeals the district court's order granting the appellees' motion to compel arbitration pursuant to the Federal Arbitration Act and the denial of appellant's subsequent motion to vacate the arbitration award. We must decide whether a nonsignatory to a contract may invoke an arbitration provision contained therein, and if so, whether appellees' party-appointed arbitrator acted improperly. We AFFIRM the district court's judgment.

## BACKGROUND

The defendant-appellant, Sunkist Growers, Inc. (hereinafter "Sunkist") is the exclusive owner and licensor of the "Sunkist" trademark. General Cinema Corporation ("GCC") obtained the contractual right from Sunkist to market and sell an orange soda under the "Sunkist" brand name. To produce and market this soft drink, GCC created a wholly owned subsidiary known as Sunkist Soft Drinks ("SSD"). Subsequently, Sunkist and SSD entered into a license agreement which provided a detailed framework for the marketing and sale of "Sunkist" soft drinks. The license agreement included the following arbitration clause:

> Except for any claim with respect to the ownership rights in Licensed Trademarks, *any controversy or claim arising out of or relating to this Agreement or the breach thereof,* including those regarding termination or failure to renew this Agreement, *shall be settled by arbitration in accordance with the Rules of the American Arbitration Association,* and judgment upon the award rendered by the Arbitrators may be entered in any Court having jurisdiction thereof. The Arbitration Tribunal shall be comprised of two party-designated arbitrators, one selected by Sunkist and one selected by SSD, and a third neutral arbitrator selected by the parties in accordance with the Rules of the American Arbitration Association. (emphasis added).

In November 1984, Del Monte Corporation ("Del Monte") acquired the stock of SSD from GCC. After acquiring the stock, Del Monte absorbed SSD into its own beverage products division, known as Del Monte Franchised Beverage Products. By placing the "Sunkist" brand under a single administration with its own soft drink brands, Del Monte effectively stripped SSD of its employees and management and any other separate operating status.

On July 18, 1986, Del Monte and its wholly owned subsidiary, SSD, filed a declaratory relief action against Sunkist in the District Court for the Northern District of Georgia seeking a declaration that the controversy relating to SSD's performance under the license agreement was subject to arbitration. Shortly after the original complaint was filed, SSD was sold to a third party, Cadbury Schweppes, Inc., a fact that was reflected in Del Monte's amended complaint, which also added Nabisco Brands, Inc., Del Monte's sister company, as a party plaintiff.

On February 2, 1987, Sunkist filed a separate complaint against Del Monte and SSD in the District Court for the Central District of California. Sunkist asserted ten claims against Del Monte and SSD, some sounding in tort and some in contract, arising out of Del Monte's alleged interference with the Sunkist–SSD license agreement.

On March 12, 1987, the district court approved SSD's dismissal of its claims against Sunkist in the Georgia action, and Sunkist voluntarily dismissed SSD from the California action. On November 20, 1987, Sunkist filed counterclaims against Del Monte in the Georgia action alleging essentially the same ten claims that were then pending in the California action, plus an eleventh claim for abuse of process. Sometime thereafter, the California action was transferred to the Northern District of Georgia and became a companion to this case.

On October 5, 1987, Del Monte filed a motion to compel arbitration on the grounds that Sunkist was contractually obligated to

arbitrate its claims under the terms of the license agreement. The district court granted Del Monte's motion to compel arbitration. Sunkist filed an interlocutory appeal from that order which this court dismissed, sua sponte, for lack of jurisdiction following the 1988 amendment of 9 U.S.C. § 16 (formerly § 15, renumbered by amend. 1990).

Each party designated an arbitrator and then mutually agreed upon a third, neutral arbitrator pursuant to the license agreement and the Rules of the American Arbitration Association ("AAA"). Del Monte designated Jessie Meyers as its party-appointed arbitrator.

During the time leading up to the arbitration hearing, Mr. Meyers met with counsel and other representatives of Del Monte to prepare for the hearing. Mr. Meyers met with six individuals identified by Sunkist: Argabright, Mullin, Murray, Watson, Antle, and O'Reilly. Argabright, Mullin, and Murray, were all former Del Monte employees and officers who were responsible for Del Monte's conduct during the relevant time period. Watson and Antle were consultants retained by Del Monte. Mr. O'Reilly was a third party witness interviewed by Del Monte's counsel in Mr. Meyers' presence. After being designated as an arbitrator, Mr. Meyers made a written disclosure to the AAA pursuant to Cannon VII of the AAA's Code of Ethics for Arbitrators in Commercial Disputes.[1] Prior to the arbitration hearing, Sunkist filed a motion with the AAA requesting that the AAA refrain from confirming Mr. Meyers appointment to the arbitration panel based on his prehearing contact with potential witnesses. The AAA refused to withdraw the appointment, and Sunkist

raised the matter with the district court. The district court declined to rule on the merits of the motion, concluding that it was premature and should be decided only after the arbitration award was rendered.

The arbitration panel, in a two-to-one decision with Sunkist's party-designated arbitrator dissenting, entered an award in favor of Del Monte. Sunkist then moved to vacate the award, relying on allegations of misconduct by Mr. Meyers. The district court denied the motion to vacate the award and granted the motion to confirm. This appeal followed.

## STANDARD OF REVIEW

We review *de novo* the district court's order compelling arbitration. *McBro Planning & Dev. Co., v. Triangle Elec. Constr. Co., Inc,* 741 F.2d 342, 343 (11th Cir.1984). We review the district court's order confirming the arbitration award under the Federal Arbitration Act and denying Sunkist's motion to vacate the same for an abuse of discretion. *Schmidt v. Finberg,* 942 F.2d 1571, 1573 (11th Cir.1991).

## DISCUSSION

I. The Arbitration Clause

Initially, Sunkist asserts that the district court erred in determining, as a matter of law, the arbitrability of its claims against Del Monte. Sunkist argues that a factual issue exists as to whether Sunkist consented to arbitrate with Del Monte, and therefore, it is entitled to a jury trial on this issue pursuant to 9 U.S.C. § 4 (1970).[2] Although arbi-

1. The disclosures by Mr. Meyers included the following:

   1. Pursuant to Cannon VII.A.1, I fully understand that even though I may be predisposed for the parties that appointed me, I am nevertheless obligated to act in good faith with integrity and fairness.

   4. As permitted by Cannon VII.C.(2), I have communicated with the party nominating me in connection with my nomination as a non-neutral arbitrator and my possible testimony as an expert witness in the underlying litigation. I intend to continue to communicate with them after my formal appointment. I further under-

   stand that under the code of ethics applicable to the non-neutral arbitrators in this proceeding that, having announced my intention to continue communicating with the parties appointing me I am not required to make any further disclosure regarding my future communications.

2. 9 U.S.C. § 4 provides:

   "If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue ... the party alleged to be in default may demand a jury trial of such issue, and upon demand the court shall make an order referring the issue or issues to a jury...."

tration is a contractual right that is generally predicated on an express decision to waive the right to trial in a judicial forum, this court has held that the lack of a written arbitration agreement is not an impediment to arbitration. *McBro*, 741 F.2d at 344. Sunkist concedes that there are certain limited exceptions, such as equitable estoppel, that allow nonsignatories to a contract to compel arbitration. In the instant case, there is no dispute that an arbitration agreement existed between Sunkist and SSD. The only issue before us regarding the arbitration clause is whether Sunkist is equitably estopped from contesting Del Monte's standing to invoke the clause, which is a question of law. There being no issue of material fact, Sunkist is not entitled to a jury trial and the district court was correct in resolving this issue as a matter of law.

■ Sunkist next contends that the district court improperly invoked the doctrine of equitable estoppel in granting Del Monte's motion to compel arbitration. The district court, following the reasoning of the Seventh Circuit in *Hughes Masonry Co. v. Greater Clark County School Bldg. Corp.*, 659 F.2d 836 (7th Cir.1981), held that Sunkist was equitably estopped from asserting the lack of a written agreement as a defense. Sunkist argues that it did not consent to nor intend to arbitrate any claims with Del Monte. Absent a written agreement to arbitrate with Del Monte itself, Sunkist asserts that the district court erred in compelling arbitration.

In *Hughes Masonry*, the plaintiff-contractor sought to avoid arbitration because a construction manager involved in the dispute was not a signatory to the construction agreement containing the arbitration provision. The Seventh Circuit noted that, although the plaintiff had characterized its claims against the construction manager as sounding in tort, i.e., intentional and negligent interference with contract, in substance the complaint was based on the manager's alleged breach of the obligations and duties assigned to it in the agreement. *Hughes Masonry*, 659 F.2d at 838. The Seventh Circuit held that since the plaintiff ultimately must rely on the terms of the construction agreement in its claims against the construc-

tion manager, the plaintiff was equitably estopped from repudiating the arbitration clause of the agreement. *Id.* at 840–41.

This court adopted the reasoning of *Hughes Masonry* in *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co., Inc.*, 741 F.2d 342 (11th Cir.1984). On facts nearly identical to *Hughes Masonry*, this court held that a party may be estopped from asserting that the lack of a written arbitration agreement precludes arbitration. *Id.* at 344. The *McBro* court noted the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract, and decided that the claims were "intimately founded in and intertwined with the underlying contract obligations." *Id.*

The license agreement at issue here does not specify or make mention of any duties or obligations that Del Monte owes to Sunkist. On this basis, Sunkist attempts to distinguish the instant case from *McBro* and *Hughes*. Although the nonsignatories were expressly mentioned in the contracts at issue in *McBro* and *Hughes Masonry*, and each court took this into account, the reference to a third party was neither a crucial nor dispositive factor in either case. Instead, these decisions rest on the foundation that ultimately, each party must rely on the terms of the written agreement in asserting their claims. The references in the contracts to the nonsignatories merely added further support to the courts' conclusions that the claims against the third parties were "intimately founded in and intertwined with the underlying contract obligation." Indeed, the Fourth Circuit has adopted the reasoning of *McBro* and applied it to facts that are nearly identical to the instant case. *See J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315 (4th Cir.1988). In *J.J. Ryan*, the Fourth Circuit stated that "[w]hen the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement." *Id.* at 320–21. Therefore, the focus of our inquiry should be on the nature of the underlying claims as-

serted by Sunkist against Del Monte to determine whether those claims fall within the scope of the arbitration clause contained in the license agreement.

Arguably, the eleven counterclaims filed by Sunkist against Del Monte sound in tort.[3] However, "[i]t is well established that a party may not avoid broad language in an arbitration clause by attempting to cast its complaint in tort rather than contract." *McBro*, 741 F.2d at 344.[4]  Essentially, Sunkist contends that Del Monte, through its management and operation of SSD, caused SSD to violate various terms and provisions of the license agreement.  Each claim asserted by Sunkist makes reference to the license agreement.  Although Sunkist does not rely exclusively on the license agreement to support its claims, each claim presumes the existence of such an agreement.  We find that each counterclaim maintained by Sunkist arises out of and relates directly to the license agreement.

In addition, upon acquiring ownership of SSD, Del Monte ceased operating it as an independent enterprise and absorbed it into Del Monte's own internal soft drink division.  For all practical purposes, SSD lost its independent operating status and became a part of Del Monte.  The nexus between Sunkist's claims and the license agreement, as well as the integral relationship between SSD and Del Monte, leads us to the conclusion that the claims are "intimately founded in and intertwined with" the license agreement.  Therefore, we hold that Sunkist is equitably estopped from avoiding arbitration of its claims.

## II.  Arbitrator Conduct

Sunkist contends that the conduct of Jessie Meyers, the party-designated arbitrator chosen by Del Monte, was sufficiently inappropriate to constitute evident partiality and prejudicial misconduct in violation of § 10(a)(2) and (a)(3) of the Federal Arbitration Act, 9 U.S.C. § 1 et seq.  Sunkist moved to vacate the arbitration award pursuant to § 10 which provides that a district court may vacate an arbitral award in certain limited circumstances, including:

> (2) Where there was evident partiality or corruption in the arbitrators, or either of them.

> (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy;  or of any other misbehavior by which the rights of any party have been prejudiced.  9 U.S.C. § 10(a).

The district court denied Sunkist's motion and confirmed the award.

Sunkist argues that we should impose upon a party-appointed arbitrator the burden of avoiding even the appearance of bias and that the mere possibility of bias is sufficient to justify a finding of evident partiality.  *See Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968) (Rule requiring neutral arbitrators to disclose any substantial relationships they may have with the arbitration parties is based on the premise of avoiding the appearance of bias.).  The Eleventh Circuit has addressed the issue of a neutral arbitrator's conduct and found that any conduct that creates "a reasonable appearance of bias" warrants setting aside an arbitration award on the ground of "evident partiality."

---

**3.**  The counterclaims were for:
(1) tortious interference with contract;  (2) tortious interference with prospective advantage;  (3) trademark infringement;  (4) unfair competition in violation of 15 U.S.C. § 1125;  (5) unfair competition in violation of the California Business Code;  (6) conspiracy to breach contract;  (7) conspiracy to breach the covenant of good faith and fair dealing;  (8) civil conspiracy;  (9) fraudulent misrepresentation;  (10) declaratory relief;  and (11) abuse of process.

**4.**  The arbitration clause at issue in this case provides that "any controversy or claim arising out of or relating to this Agreement or the breach thereof, including those regarding termination or failure to renew this Agreement, shall be settled by arbitration."  This language is nearly identical to the language used in the arbitration clauses in *Hughes Masonry*, 659 F.2d at 837 (all disputes "arising out of, or relating to, this contract or the breach thereof ... shall be decided by arbitration");  and *Mcbro*, 741 F.2d at 343 (any controversy "arising out of or relating to this [Contract] or the breach thereof" shall be settled by arbitration).

*See Middlesex Mutual Ins. Co. v. Levine,* 675 F.2d 1197 (11th Cir.1982); *Lozano v. Maryland Casualty Company,* 850 F.2d 1470 (11th Cir.1988).[5]

However, the case sub judice involves the conduct of a party-appointed arbitrator, which is easily distinguished from the above cited cases. The AAA, under whose rules the parties were contractually bound to proceed,[6] recognizes inherently different rules for neutral and nonneutral arbitrators and imposes less exacting duties and less burdensome disclosure rules upon nonneutral arbitrators.

■ Sunkist concedes that Mr. Meyers, as a party-appointed arbitrator, may be predisposed or sympathetic toward Del Monte's position. *See* AAA Code of Ethics for Arbitrators in Commercial Disputes, Canon VII (Party-appointed arbitrators "may be predisposed towards the party who appointed them but in all other respects are obligated to act in good faith and with integrity and fairness."); *see generally Lozano,* 850 F.2d at 1472 ("An arbitrator appointed by a party is a partisan only one step removed from the controversy and need not be impartial.") (applying Florida arbitration statute). However, the AAA does require that nonneutral arbitrators act in good faith and with integrity and fairness. *See* Code of Ethics for Arbitrators in Commercial Disputes, ·Cannon VII.[7] Consequently, Mr. Meyers conduct as a party-appointed arbitrator must be evaluated to determine whether he acted in good faith and with integrity and fairness.

■ Sunkist alleges that before the arbitration but after his appointment as Del Monte's arbitrator, Mr. Meyers assisted Del Monte in preparing its case by attending and participating in meetings with Del Monte's witnesses, that he suggested lines or areas of testimony, that he helped select one of Del Monte's consultants, and that he advised an expert witness on how to improve a chart related to the expert's testimony. Sunkist argues that in meeting with Del Monte's representatives and witnesses in preparation for the hearing, Mr. Meyers engaged in the *ex parte* receipt of evidence. However, none of the Del Monte representatives nor the third party witness, Mr. O'Reilly, were placed under oath before being interviewed, and none gave testimony in any sense of the word. Sunkist has made no showing that Mr. Meyers discussed any information that he received during the prehearing interviews with the other arbitrators, or that any of the arbitrators, including Mr. Meyers, based their deliberations and award on anything other than the evidence of record. Mr. Meyers' conduct is not only unobjectionable, but commonplace. *E.g. Stef Shipping Corp. v. Norris Grain Co.,* 209 F.Supp. 249, 251 (D.C.N.Y.1962) ("The fact that [a party-appointed arbitrator] consulted with his nominator prior to the arbitration hearing is not shocking. It would be unrealistic to expect a party engaged in an arbitration dispute to nominate an arbitrator without telling him what the dispute is about. It must be pointed out that there is no evidence that the award itself was based upon evidence or documents not before the arbitration panel, only that [the party-appointed arbitrator] had conferred with respondent prior to the start of the arbitration hearings.... This is not the type of irregularity which [9 U.S.C. § 10] contemplates as being sufficient to vacate an otherwise valid arbitration award.")

■ Sunkist also contends that Mr. Meyers exhibited evident partiality because he prejudged critical points of the dispute between Sunkist and Del Monte in a publication called *Beverage Digest,* a biweekly soft-drink industry newsletter owned and published by

---

5. Both *Middlesex* and *Lozano* review the application of Fla.Stat. 682.13(1) to the conduct of a neutral arbitrator. Fla.Stat. 682.13 differs from 9 U.S.C. § 10 in that the Florida law limits the application of the "evident partiality" standard only to neutral arbitrators. Otherwise, the similarity in language suggests similar legislative intent. *Middlesex,* 675 F.2d at 1200.

6. Unlike this case, the Rules of the AAA were not controlling in *Commonwealth Coatings,* 393 U.S. 145, 149, 89 S.Ct. 337, 339, 21 L.Ed.2d 301.

7. In defining the standard, Cannon VII provides as an example that a non-neutral arbitrator "should not engage in delaying tactics or harassment of any party or witness and should not knowingly make untrue or misleading statement to the other arbitrators."

Mr. Meyers. Sunkist points to the fact that before Mr. Meyers' appointment, he reported that external market factors were responsible for a decline in sales of "Sunkist" brand orange soda; a position contrary to Sunkist's claims that Del Monte's tortious conduct caused much of the decline in sales.[8]

■ We fail to see how this prejudiced Sunkist or affected its right to a fair hearing. As we noted earlier, a party-appointed arbitrator is permitted, and should be expected, to be predisposed toward the nominating party's case. Several courts have recognized that "entanglement" with and knowledge about relative industry concerns are laudatory qualifications for those who sit as arbitrators. *See Morelite Constr. Corp. v. New York City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 83 (2nd Cir.1984) ("[P]arties agree to arbitrate precisely because they prefer a tribunal with expertise regarding the particular subject matter of their dispute.... Familiarity with the discipline often comes at the expense of complete impartiality."); *see also Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 150, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968) (White & Marshall JJ., concurring) ("[A]rbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance.... I see no reason to disqualify the best informed and most capable arbitrators."). Mr. Meyers merely published his opinions on what was taking place within the soft drink industry. Whether he was correct or not in his opinion, it is not sufficient to disqualify him as an arbitrator.

■ Finally, Sunkist contends that Mr. Meyers breached his duty of disclosure, by failing to reveal the exact nature and extent of his communications with Del Monte before the arbitration hearings. Under Cannon II, arbitrators are required to disclose only two kinds of information: (1) any direct or indirect financial or personal interest in the outcome of the arbitration, and (2) any existing or past financial, business, professional, family, or social relationships which were likely to affect impartiality or which might reasonably create an appearance of partiality or bias. Cannon VII provides that "disclosure by non-neutral arbitrators should be sufficient to describe the general nature and scope of any interest or relationship...." The record clearly shows that Mr. Meyers announced in his formal disclosure letter that he had been in contact with Del Monte's experts before the parties were notified of his appointment and that he intended to continue to communicate with them after his formal appointment. There has been no showing that Mr. Meyers had a direct financial or familial relationship with any party to the arbitration. We agree with the district court that Mr. Meyers met his obligations of disclosure according to the AAA rules.

A party-appointed arbitrator must consider the evidence of record in good faith and with integrity and fairness. The fact that Mr. Meyers may have been predisposed towards Del Monte's case is not sufficient to vacate the arbitration award. The evidence relied upon by Sunkist is insufficient to support a finding that Mr. Meyers acted improperly either before or during the arbitration hearing. Therefore, the district court did not abuse its discretion in denying Sunkist's motion to vacate the arbitration award.

For all of the foregoing reasons, the judgment of the district court is AFFIRMED.

---

**8.** In the May 16, 1986, edition of *Beverage Digest*, Mr. Meyers reported:

Because of looming orange Minute Maid/Slice entries and massive royalty payments—$7½ million annually to [Sunkist] Growers—General Cinema sells Sunkist soft drinks rights to Del Monte for $57 million, 11/84. At present Coke, Pepsi orange entries in process of pressing Sunkist's segment strength to pulp.