DENNIS, Circuit Judge, dissenting:
“[NJearly anything can be called estop-pel. When a lawyer or a judge does not know what other name to give for his decision to decide a case in a certain' way, he says there is an estoppel.” [1] The trouble with that kind of use. of the estoppel label by the majority in this case making circuit precedent is that it will seriously hinder this court in upholding the basic principle that a person has a right to a court’s decision about the merits of a dispute unless he has agreed to submit it to arbitration. Because the majority decision conflicts with the Supreme Court’s recent emphatic affirmations of that principle, and the precedents of this circuit, I respectfully dissent.
In First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), the Supreme Court reaffirmed important contractual arbitration principles: (1) Contract Governs Whether A Dispute Is Arbitrable Or Liti-gahle: “[AJrbitration is simply a matter of contract between the parties; it is a way to resolve those disputes-but only those disputes-that the parties have agreed to submit to arbitration.”[2] “[A] party who has not agreed to arbitrate will normally have a right to a court’s decision about the merits of its disputel]”[3] (2) State-Law Contract Principles Govern Standing And Obligation To Arbitrate: “When deciding whether the parties agreed to arbitrate a certain matter ... courts generally ... should apply ordinary state-law principles that govern the formation of contracts.”[4] (3) Parity Of Contractual Enforcement: “After all, the basic objective in this area is not to resolve disputes in the quickest manner possible, no matter what the parties’ wishes,[5] but to ensure that commercial arbitration agreements, like other contracts ‘ “are enforced according to their terms,” ’[6] and according to the intentions of the parties[.J”[7] (4) Standard of Review: “[RJeview of ... a district court decision confirming an arbitration award *532 on the ground that the parties agreed to submit their dispute to arbitration, should proceed like review of any other district court decision finding an agreement between parties, e.g., accepting findings of fact that are not ‘clearly erroneous’ but deciding questions of law de novo.”[8] (Internal citations placed in footnotes).
Air Line Pilots Ass’n v. Miller, 523 U.S. 866, 118 S.Ct. 1761, 140 L.Ed.2d 1070 (1998), strongly confirmed these principles in holding that non-union pilots challenging the agency fee collected by the union could not be required to arbitrate their challenges because they had not agreed to do so: “Ordinarily, ‘arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.’ ” Id. at 876, 118 S.Ct. 1761 (citing Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)); see also First Options, 514 U.S. at 942, 115 S.Ct. 1920 (“a party who has not agreed to arbitrate will normally have a right to a court’s decision about the merits of its . dispute”).
As a general rule, an arbitration clause cannot be invoked by a non-party to the arbitration contract, and only parties to the arbitration agreement are bound to arbitrate. See 1 Gabriel M. WilneR, Domiíe Comm Arbitration § 10:00, at 1 (Rev. Ed.1993) (citing, inter alia, Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287 (3d Cir.1996); Gingiss Int’l v. Bormet, 58 F.3d 328 (7th Cir.1995); United States v. Harkins Builders, Inc., 45 F.3d 830 (4th Cir.1995)) [hereinafter Domke]. The federal policy favoring arbitration is strong, but it alone cannot authorize a non-party to invoke arbitration or require a non-signatory to arbitrate. See id. Nonetheless, a non-signatory may be bound by or acquire rights under an arbitration agreement under ordinary state-law principles of agency or contract. Id.; First Options, 514 U.S. at 944, 115 S.Ct. 1920.
Courts have recognized a number of theories arising out of common law principles of contract and agency law under which non-signatories may be bound to the arbitration agreements of others. For example, 1) incorporation by reference; 2) assumption by conduct; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel. See Thomson-CSF, S.A. v. American Arbitration Ass’n, 64 F.3d 773, 776-80 (2d Cir.1995) (citing as examples Matter of Arbitration Between Keystone Shipping Co. & Texport Oil Co., 782 F.Supp. 28, 31 (S.D.N.Y.1992)(incorporation by bill of lading); Gvozdenovic v. United Air Lines, Inc., 933 F.2d 1100, 1105 (2d Cir.)(assumption by conduct), cert. denied, 502 U.S. 910, 112 S.Ct. 305, 116 L.Ed.2d 248 (1991); Interbras Cayman Co. v. Orient Victory Shipping Co., S.A., 663 F.2d 4, 6-7 (2d Cir.1981) (agency); Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int’l. Inc., 2 F.3d 24, 26 (2d Cir.1993)(veil-piercing); Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 138-39 (2d Cir.1991)(same); Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1064 (2d Cir.1993)(non-signatory bound to arbitration contract by estoppel)).
In theory, under ordinary state-law principles of equitable and promissory es-toppel, a non-party to a contract containing an arbitration clause may invoke the clause and compel a signatory party to arbitrate when the signatory reasonably should have expected that, because of his statements or conduct, the non-signatory would be induced to rely justifiably on the contract and would be injured thereby if the signatory refused to recognize the non-signatory’s rights or entitlements with respect to the contract.[9] However, there *533 have been few, if any, cases in which a non-signatory has successfully invoked an arbitration clause against a party signatory to the contract under ordinary equitable or promissory estoppel principles. In a relatively few arbitration eases, a non-signatory to the arbitration agreement has been allowed to compel arbitration under a spurious estoppel theory when the peculiar integrated or interlocking circumstances of the parties’ relationships, related contracts, contractually assigned responsibilities, conduct, and disputes would allow the inference that the signatory and non-signatory parties have by an agreement implied in fact become bound reciprocally by the arbitration clause or the contract of which it is a part. See MS Dealer Service Corp. v. Franklin, 177 F.3d 942 (11th Cir.1999); Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753 (11th Cir.), cert. denied, 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994); J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315 (4th Cir.1988); McBro Planning & Development Co. v. Triangle Elec. Const. Co., Inc., 741 F.2d 342 (11th Cir.1984); Hughes Masonry Co., Inc. v. Greater Clark County School Bldg. Corp., 659 F.2d 836 (7th Cir.1981); cf. 1 Domke § 10:07, at 18-20.
In truth, however, the bases of facts and reasoning upon which the courts in those cases ordered a signatory to an arbitration agreement to arbitrate a dispute with a non-signatory have the earmarks of a foundation for an agreement implied in fact rather than an ordinary equitable or promissory estoppel. In the courts’ opinions the non-signatory is said to have standing to compel a signatory to arbitrate, rather than litigate, a justiciable claim against the non-signatory, if, in addition to other significant factors, there is a close relationship between signatory and non-signatory entities and the signatory’s claim against the non-signatory is intertwined with an arbitrable dispute under the contract. However, the facts in those cases which made the relationships “close” and the claims “intertwined,” viz., the disputants’ voluntary and knowing formation of (and performance under) interlocking or integrated contracts, their bargained for exchanges of promises and/or performances between themselves and others, and, in Sunkist and J.J. Ryan, the parent-subsidiary corporate relationship, indicate the existence of an implied in fact agreement rather than an ordinary equitable or promissory estoppel.
“An agreement implied in fact is ‘founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties shoyving, in the light of the surrounding circumstances, their tacit understanding.’ ” Hercules, Inc. v. United States, 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (quoting Baltimore & Ohio R. Co. v. United States, 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)).[10] The doctrine of equitable estoppel generally provides “that a representation of past or existing fact made to a party who relies upon it reasonably may not thereafter be denied by the party making the representation if permitting the denial would result in injury or damage to the party who so relies.”[11] The *534 widely accepted general statement of promissory estoppel, which developed against the backdrop of equitable estoppel, is set forth by Restatement (Second) Of ContRacts § 90(1): “A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.” In determining whether a person is bound either by an agreement implied in fact or by the ordinary principles of equitable or promissory estoppel, it should be kept in mind that “[j]ust as assent may be manifested by words or other conduct, sometimes including silence, so intention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance.”[12] A brief review of Hughes, McBro, Sunkist and MS Dealer shows ample evidence of assents and promises that may have more appropriately warranted basing those decisions on agreements implied in fact, or perhaps on ordinary promissory estoppel, rather than upon the highly abstract new theory of an “estoppel” loosely based on “close” relationships, “intertwined” claims, and other variable factors.
The facts in McBro and Hughes were highly suggestive of an implied in fact agreement between the parties to be mutually bound by the contract containing the arbitration clause.[13] In each case a construction contractor entered a contract with the owner of the proposed facility containing an arbitration clause. The same contract designated a non-signatory party as construction manager and outlined the duties of the owner, construction contractor, construction manager, and, in one case, the architect, with respect to the construction project. The construction managers in both cases had not signed the owner-contractor agreement but had signed separate contracts containing similar arbitration clauses with either the owner or the owner’s architect. By performing duties and accepting benefits under the interlocking and integrated system of construction contracts and relationships the contractors impliedly agreed to be bound to arbitrate disputes with the construction managers concerning the performance of the managers’ duties assigned by and performed under the owner-contractor agreement, although the managers had only signed the related but separate contract documents between themselves and the owner or its architect.
In Sunkist a non-signatory parent corporation was granted standing to arbitrate disputes arising out of the performance of a contract containing an arbitration clause between the parent’s wholly owned subsidiary and the other signatory to the contract. The court relied not only on the close relationships of the entities and the close resemblance of the arbitrable and litigable claims but also on a form of corporate veil piercing: “ ‘When the charges against a parent company and its subsidiary are based on the same facts and are *535 inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration.’ ” Sunkist, 10 F.3d at 757 (quoting J.J. Ryan, 863 F.2d at 320-21). The Fourth Circuit in J.J. Ryan relied on the foregoing veil piercing language quoted from its opinion and merely noted in passing that the same result had been reached under a theory of equitable estoppel in McBro. See J.J. Ryan, 863 F.2d at 321.
In MS Dealer, Sharon Franklin agreed to purchase a car from Jim Burke Motors and signed a buyer’s order with Burke. The buyer’s order incorporated by reference a retail installment contract between Franklin and Burke which provided that Franklin was being charged $990.00 for a service contract under which MS Dealer Service Corporation (apparently designated by name in the buyer’s order) agreed to provide services for Franklin’s car. (The - court of appeal’s opinion suggests that MS Dealer entered an oral or written contract with Burke or Franklin or both to provide services for Franklin’s car.) The buyer’s order contained an arbitration clause which provided that “all disputes and controversies of every kind and nature between buyer and Jim Burke Motors, Inc. arising out of or in connection with the purchase of this vehicle will be resolved by arbitration.” Also, in another passage, the buyer’s order stated that “[a]ll disputes and controversies of every kind and nature between the parties hereto arising out of or in connection with this contract” shall be submitted to arbitration. MS Dealer did not sign the buyer’s order or the installment contract.
Franklin sued Burke and MS Dealer in state court claiming that MS Dealer improperly conspired and colluded with Burke and Chrysler Credit Corporation, the assignee of the retail installment contract, in a scheme to defraud her by imposing an excessive charge of $990.00 for the service contract and dividing the excess amount. Burke filed a motion in state court to compel Franklin to arbitrate, which was granted and resulted in an arbitration award in favor of Burke and a dismissal of the state suit against Burke. MS Dealer sued Franklin in federal district court to compel her to arbitrate her claims against it. The court of appeals reversed the district court’s dismissal of MS Dealer’s petition and granted the defendants’ motion to stay the action and compel arbitration.
The MS Dealer court, in concluding that Franklin was equitably estopped from avoiding arbitration with MS Dealer, stated:
It is important to note that Franklin’s obligation to pay the $990.00 charge arose under the Buyers Order and that she specifically alleges that MS Dealer worked hand-in-hand with Jim Burke and Chrysler Credit Corporation in this alleged fraudulent scheme. Her “allegations of such pre-arranged, collusive behavior establish! ] that [her] claims against [MS Dealer are] intimately founded in and intertwined with the obligations imposed by the [Buyers Order].”
MS Dealer, 177 F.3d at 948 (quoting Boyd v. Homes of Legend, Inc., 981 F.Supp. 1423, 1433 (M.D.Ala.1997)).
As in Hughes and McBro, the circumstances of interlocking and integrated contracts would allow the inference that both Franklin and MS Dealer had agreed to arbitrate any dispute between them arising out of or connected with Franklin’s purchase of the automobile. Indeed, the ambiguous buyer’s order contract reasonably could be construed to include MS Dealer, as one of the “parties hereto.” Further, Franklin reasonably should have understood that MS Dealer agreed to provide the service contract in exchange for the compensation it was to receive under the buyer’s order and the retail installment contract and would call upon her to arbitrate any dispute related to the formation or performance of the service contract. Moreover, because Franklin’s allegations of Burke’s fraudulent overcharging *536 for the service contract was clearly an arbitrable dispute arising out of and connected with the purchase of the vehicle, MS Dealer’s alleged conspiracy and collusion with Burke in the fraudulent overcharge was an essential part of the arbitra-ble dispute between Franklin and Burke.
Nevertheless, the Eleventh Circuit chose to use the spurious estoppel theory or label and, in justifying its decision, attempted to draw from the case some abstract “equitable estoppel” explanatory principles:
First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause “must rely on the terms of the written agreement in asserting [its] claims” against the non-signatory. Sunkist Soft Drinks, 10 F.3d at 757. When each of a signatory’s claims against a non-signatory “makes reference to” or “presumes the existence of’ the written agreement, the signatory’s claims “arisef ] out of and relatef ] directly to the [written] agreement,” and arbitration is appropriate. Id. at 758. Second, “application of equitable estoppel is warranted ... when the signatory [to the contract containing the arbitration clause] raises allegations of ... substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract.” Boyd, 981 F.Supp. at 1433.
MS Dealer, 177 F.3d at 947. The remainder of the MS Dealer opinion, however, in its painstaking analysis of the facts and reasoning based on all of the circumstances involved, indicates no intention that the foregoing principles should be applied as free-standing rules of law. The Eleventh Circuit concluded that Franklin was compelled to arbitrate her dispute with MS Dealer only after pointing out facts indicating that both parties had actually manifested their mutual assent to a bargain in which they exchanged promises of performances with each other and with Jim Burke Motors; that the buyer’s order incorporating the arbitration clause and the retail installment contract, which incorporated the service contract with MS Dealer, were all parts of the bargain of which Franklin, MS Dealer, and Burke were aware or should have been aware before they entered the agreement; and that, if MS Dealer was a co-conspirator with Burke in defrauding Franklin as she alleged, her claim against MS Dealer was part of her dispute with Burke, with whom she was a co-signatory of the arbitration agreement. See id. at 947-49.
On the other hand, the Second Circuit, in Thomson-CSF, -S'. A v. Am. Arbitration Ass’n, 64 F.3d 773 (2d Cir.1995), refused to accept “[a]nything short of requiring a full showing of some accepted theory under agency or contract law” before compelling arbitration between a signatory and a non-signatory. Id. at 780. In Thomsorir-CSF, the court of appeals reversed the district court’s order compelling a non-signatory parent corporation to arbitrate a dispute with a third party under an arbitration agreement signed by the parent’s subsidiary corporation prior to the parent’s acquisition of the subsidiary. The district court had determined that the claims of the third party, E & S, did not fall within any of the traditional theories for binding a non-signatory, but nevertheless ordered Thomson, the non-signatory, to arbitrate a dispute with E & S, applying a “hybrid approach” based on Thomson’s conduct in voluntarily becoming an affiliate of its subsidiary, Rediffusion, on the degree of control Thomson exercised over Rediffusion, and on the interrelatedness of the issues. In so doing, the Second Circuit held, “the district court improperly extended the law of this Circuit and diluted the protections afforded nonsignatories by the ‘ordinary principles of contract and agency.’ A non-signatory may not be bound to arbitrate except as dictated by some accepted theory under agency or contract law.” Id. at 780 (quoting McAllister Bros., Inc. v. A & S Transp. Co., 621 F.2d 519, 524 (2d Cir.1980))(internal citation omitted).
*537 The Thomson-CSF court addressed a situation in which a signatory seeks to compel a non-signatory, the inverse of the pattern in MS Dealer, Sunkist, J.J. Ryan, McBro and Hughes. Nonetheless, Thomson-CSF lends support to the conclusion that the Hughes-McBro line of cases lacked a valid basis in the ordinary principles of estoppel or veil-piercing for compelling the signatories to arbitrate with the non-signatories. Instead, as Thomson-CSF implicitly suggests, in MS Dealer, McBro and Hughes, the only valid basis for compelling the signatories to arbitrate with the non-signatories was that their knowing participation in the reticulated transactional arrangements, and their performance and conduct thereunder, allowed the inference that they agreed to be mutually bound by the contract including the arbitration clause. After taking Sunkist, J.J. Ryan, and McBro into account, the Second Circuit in Thomsoiu-CSF distinguished them as inapposite to the case before it on several grounds, including: (1) when Thomson acquired Re-diffusion as its subsidiary, Thomson explicitly disavowed any obligations under the working agreement, including the arbitration clause, between Rediffusion and E & S, see Thomson-CSF, 64 F.3d at 777; (2) “[v]eil piercing determinations are fact specific and ‘differ[ ] with the circumstances of each case.’ ”, Id. at 777-78 (quoting American Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir.), cert. denied, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988)); “E & S has not demonstrated that Thomson exerted the degree of control over Rediffusion necessary to justify piercing the corporate veil.”, Id. at 778; (3) “Thomson ... cannot be es-topped from denying the existence of an arbitration clause to which it is a signatory because no such clause exists. At no point did Thomson indicate a willingness to arbitrate with E & S.” Id. at 779; (4) “[t]he district court ... improperly extended the limited theories upon which this Court is willing to enforce an arbitration agreement against a non-signatory. The district court’s hybrid approach dilutes the safeguards afforded to a non-signatory by the ‘ordinary principles of contract and agency’ and fails to adequately protect parent companies, the subsidiaries of which have entered into arbitration agreements.” Id. at 780.
The Second Circuit’s adherence to “ordinary principles of contract and agency” in Thomsorir-CSF was consistent with the Supreme Court’s admonition and example it set in First Options as to the application of ordinary state law principles of contracts to determine whether the parties agreed to arbitrate a certain matter. As mentioned above, the Court in First Options instructed:
When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below) should apply ordinary state-law principles that govern the formation of contracts... .The relevant state law here, for example, would require the court to see whether the parties objectively revealed an intent to submit the arbitrability issue to arbitration, [citing an Illinois case for the law of the state whose law governed the workout agreement and a Pennsylvania case for the law of the state where the Kaplans objected to arbitrability]
First Options, 514 U.S. at 944, 115 S.Ct. 1920 (internal citations omitted).
The plaintiffs brought the present suit against Creative Artists and McConaughey in a Texas state court asserting a Texas state tort claim for interference with contract. Thus, the ordinary state law principles of Texas governing the formation of contracts should be applied to determine whether the plaintiffs agreed to arbitrate this matter with the defendants. The trial court acknowledged that neither of the defendants were signatories to the contract between the plaintiffs and Columbia TriStar. The trial court did not find that the plaintiffs and defendants had entered *538 an agreement, express or implied in fact, to arbitrate the tortious interference with contract claim. Instead, the trial court determined that the plaintiffs were bound by equitable estoppel to arbitrate the matter with the defendants. On appeal the defendants also rely solely on equitable estoppel.
All American jurisdictions adopt and apply a theory of promissory estoppel grounded in section 90 of the contracts restatements. 3 ERic Mills Holmes, Cor-bin on ContraCts, § 8.12, at 58 (Joseph M. Perillo ed., rev. ed.1997) [hereinafter Cor-bin], This theory is an outgrowth of and includes the earlier doctrine of equitable estoppel. See 1 E. AllaN Farnsworth, Farnsworth on Contracts § 2.19, at 137-40 (1990 and Supp.1998); 3 Corbin § 8.11, at 46. Recent Texas decisions cite and apply the second Restatement § 90. See 3 Corbin § 8.12, at 188 (citing City of Beaumont v. Excavators & Constructors, Inc., 870 S.W.2d 123, 136, 154 (Tex.App.1993, writ denied) (citing Restatement (Seoond) of ContraCts § 90); Traco, Inc. v. Arrow Glass Co., Inc., 814 S.W.2d 186, 190 (Tex.App.1991, writ denied); First State Bank in Archer City v. Schwarz Co., 687 S.W.2d 453 (Tex.App.1985, writ ref d n.r.e.)). The current three-prong Texas promissory es-toppel requisites, however, were fashioned from the first Restatement in the 1960s: (1) a promise, (2) foreseeability of reliance by the promisor, and (3) substantial reliance by the promisee to its detriment. Id. (citing, e.g., English v. Fischer, 660 S.W.2d 521, 524 (Tex.1983); Randle v. NCNB Texas Nat’l Bank, 812 S.W.2d 381 (Tex.App.1991); Aubrey v. W.O. Workman, 384 S.W.2d 389, 395 (Tex.Civ.App.1964, writ ref'd n.r.e.)). Later decisions added: (4) reliance on the promise must be reasonable, and (5) the promise will be enforced if necessary to avoid injustice. Id. (citing Texas cases).
Applying the Texas state-law principles governing the formation of contracts and promissory estoppel, it is evident that thé plaintiffs should not be compelled to arbitrate their tortious interference with contract claim with Creative Artists and McConaughey. There was no agreement between these parties, express or implied, to arbitrate that dispute. None of the requisites of section 90 of the Restatement (Seoonb) Of Contracts or of the Texas three-prong promissory estoppel have been established. There is no evidence that the plaintiffs promised the defendants anything, that they could foresee any reliance by the defendants, or that the defendants relied on a promise by the plaintiffs to defendants’ detriment.[14]
For all of these reasons, I believe that the majority has fallen into a number of serious, harmful legal errors in the present case. The amorphous, misnamed estoppel theories of MS Dealer, Sunkist, McBro, and Hughes conflict with and endanger the basic principles that the Supreme Court has held must be adhered to in compelling a person to submit to commercial arbitration, viz., (1) a person cannot be required to submit to arbitration any dispute which he has not agreed so to submit, (2) a person who has not agreed to arbitrate will normally have a right to a court’s decision about the merits of its dispute, and (3) ordinary state-law principles governing the formation of contracts should be applied when deciding whether the parties agreed to arbitrate a certain matter. This court is *539 not bound by the court of appeals’ decisions in the Hughes-McBro line of cases and should not attempt to follow them.
However, the majority erroneously attempts to follow MS Dealer and compounds its error by mistaking MS Dealer’s highly abstract explanatory “equitable estoppel” principles for the Eleventh Circuit’s complete ratio decidendi. Consequently, the majority overlooks the significance of the material facts upon which the MS Dealer decision is actually based. In contrast with the present uncomplicated case, MS Dealer involved an integrated network of interlocking agreements anchored in a buyer’s order containing an arbitration agreement. The signatories of the buyer’s order, Franklin and Jim Burke Motors, and the non-signatory of those two documents, MS Dealer, struck a bargain in which each person agreed to exchange promises of performance with the others. See Restatement (Second) of Contracts § 17. Each of the three parties manifested mutual assent to the bargain or exchanges of promises by intentional conduct from which he or she knew or had reason to know the other parties would infer such assent. See Restatement (Seoond) of Contracts §§ 18, 19. Each of the parties, including Franklin in particular, knew or had reason to know that the buyer’s order contained an arbitration agreement and incorporated by reference the retail installment contract and the vehicular service contract. Thus, the rationale of MS Dealer can be viewed as limited by its material facts and even as an enforcement of an agreement implied in fact. Consequently, if MS Dealer merely enforces an agreement implied in fact, it does no violence to the principles that a party cannot be forced to submit to arbitration a dispute that he has not agreed to so submit according to the application of ordinary state-law principles that govern the formation of contracts. The majority, on the other hand, by disregarding the important material facts underlying MS Dealer; and by adopting and applying only that decision’s skeletal explanatory theory, unleashes an indeterminate precedent capable in its application of sweeping countless parties’ disputes into arbitration without even a semblance of their agreement under ordinary state-law principles of contracts, agency or equitable estoppel.
The majority also misstates the applicable standard of review, although the error may not have had any effect upon its decision. In First Options, the Supreme Court held that the standard a court of appeals should apply when reviewing a district court decision that refuses to vacate or confirms an arbitration award should proceed by accepting findings of fact that are not clearly erroneous but deciding questions of law de novo. See First Options, 514 U.S. at 948, 115 S.Ct. 1920. “We believe ... that the majority of Circuits is right in saying that courts of appeals should apply ordinary, not special, standards when reviewing district court decisions upholding arbitration awards. For one thing, it is undesirable to make the law more complicated by proliferating review standards without good reasons.” Id. This court followed First Options in General Motors Corp. v. Pamela Equities Corp., 146 F.3d 242, 246 (5th Cir.1998) and F.C. Schaffer & Assocs., Inc. v. Demech Contractors, Ltd., 101 F.3d 40, 43 (5th Cir.1996). Accordingly, the standard of review should be the same in this case in which we are reviewing a district court’s decision that compels parties either to submit a dispute to arbitration (that they contend they have not agreed to so submit) or to abandon their right to a court’s decision about the merits of the dispute. Previous decisions of this circuit and others have said that we review the grant or denial of a motion to compel arbitration de novo. See Webb v. Investacorp, Inc., 89 F.3d 252, 257 (5th Cir.1996); Snap-On Tools Corp. v. Mason, 18 F.3d 1261, 1264 (5th Cir.1994); Armijo v. Prudential Ins. Co. of Am., 72 F.3d 793, 796 (10th Cir.1995); Kidd v. Equitable Life Assurance Soc’y of the United States, 32 F.3d 516, 518 (11th Cir. *540 1994); Sunkist, 10 F.3d at 756; Britton v. Co-op. Banking Group, 4 F.3d 742, 744 (9th Cir.1993); Trap Rock Indus., Inc. v. Local 825, Int’l Union of Operating Engineers, AFL-CIO, 982 F.2d 884, 887 (3d Cir.1992); MidAmerica Federal Sav. and Loan Ass’n v. Shearson/American Express, Inc., 886 F.2d 1249, 1259 (10th Cir.1989). Paradoxically, the majority opinion states that we review to determine only whether the district court has abused its discretion in applying equitable estoppel, but that an application of law that is erroneous, or an assessment of the evidence that is clearly erroneous, constitutes an abuse of discretion. These contradictory statements of the standard can only lead to confusion. In my opinion, abuse of discretion does not belong in our standard for reviewing whether the ordinary state-law requisites of promissory or equitable es-toppel have been met, but the district court may well have discretion in limiting the remedy as justice requires. See Restatement (Second) of ContRacts § 90(1).

. Statement of Samuel Williston, 4 ALI Proceedings 61, 89-90 (1926) (quoted by 4 Richard A. Lord, Williston on Contracts § 8.5, at 73 (4th ed.1992)) [hereinafter Williston].

. First Options, 514 U.S. at 943, 115 S.Ct. 1920 (citing AT&T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57-58 and n. 9, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995); Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 271, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995); Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625-26, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)).

. Id. at 942, 115 S.Ct. 1920.

. Id. at 944, 115 S.Ct. 1920 (citing Mastrobuono, 514 U.S. at 62-63 & n. 9, 115 S.Ct. 1212; Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 475-76, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989); Perry v. Thomas, 482 U.S. 483, 492-93 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987); 1 Gabriel M. Wilner, Domke Comm Arbitration § 4:04, at 15 (Rev. Ed. 1993)) [hereinafter Domke].

. Id. at 947, 115 S.Ct. 1920 (citing Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 219-20, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985)).

. Id. (citing Mastrobuono, 514 U.S. at 54, 115 S.Ct. 1212 (quoting Volt Information Sciences, 489 U.S. at 479, 109 S.Ct. 1248)).

. Id. (citing Mitsubishi Motors, 473 U.S. at 626, 105 S.Ct. 3346; Allied-Bruce, 513 U.S. at 271, 115 S.Ct. 834).

. First Options, 514 U.S. at 947-48, 115 S.Ct. 1920 (citing Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1509 (3d Cir.1994)).

. See, e.g., Williston, supra note 1, §§ 8.3 and 8.4; Restatement (Second) Of Contracts § 90(1) ("A promise which the promisor should reasonably expect to induce action or *533 forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.”); cf. 1 Domke § 10.07, at 18.

. See 1 Williston § 1.5, at 18-20 (citing, inter alia, Wood v. Ingram, 275 S.W. 397 (Tex.Civ.App.1924)(writ dism w.o.j.)), and stating: "The Restatement (Second)[Of Contracts §§ 4 & comment a; 91 & comment a] .... indicates that a promise may be stated in words or may be inferred wholly or partly from conduct .... a contract by conduct is, in essence, an implied in fact contract .... the Restatement, as well as the numerous cases, make the concept abundantly clear.” Id. at 24-25; see also 4 Williston §§ 8.3 and 8.4.

. 4 Williston § 8.3, at 28-30 (citing, inter alia, Morton v. Samuels, 268 S.W.2d 490 (Tex.Civ.App.1954, writref'd n.r.e.)).

. Restatement (Second) Of Contracts § 4,comment a.

. See II Ian R. Macneil et al„ Federal Arbitration Law, § 18.2.3 (Supp.1999) (analyzing the Eleventh Circuit cases of McBro Planning & Development Co. v. Triangle Elec. Const. Co., Inc., 741 F.2d 342 (11th Cir.1984) and acknowledging the opinion's heavy reliance on Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp., 659 F.2d 836 (7th Cir.1981), the editors conclude: “It should be noted that the action estopping Triangle was apparently its contracting with Hospital in the first place and performing under that contract. Thus the court could just as well have put the result in terms of consent. That is to say, Hospital and McBro could have reasonably understood from Triangle’s contracting with the hospital with knowledge of the terms of the Hospital-McBro contract that Triangle was consenting to be bound by the arbitration clause. The decision is probably most useful in simply broadening out conceptions of consent, rather than in introducing any truly separate doctrine.”).

. The district court apparently relied on Sunkist, McBro and two Texas decisions, Carlin v. 3V Inc., 928 S.W.2d 291 (Tex.App.— Houston [14th Dist.] 1996, no writ) and Fridl v. Cook, 908 S.W.2d 507 (Tex.App.—El Paso 1995, writ dism’d w.o.j.). These decisions are not relevant to the present case. Sunkist and McBro are inapposite for the reasons stated earlier. Carlin is inapt because its essential holding was simply that an assignee of an assignor's rights and duties under a contract assumes and is bound by the arbitration clause in the contract when the assignee asserts a breach of contract claim under the contract against the other signatory party to the contract. Fridl is irrelevant because its main holding was simply that a breach of contract claim based on a contract containing an arbitration clause is subject to arbitration.